IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
                                    )
UNITED MARKETING SOLUTIONS, INC.,   )
                                    )
              Plaintiff,            )   Civil No. 09-1392
                                    )
       VS.                          )   October 8, 2010
                                    )
ANGIE FOWLER, et al.,               )
                                    )
              Defendants.           )
_____)
```

REPORTER'S TRANSCRIPT

MOTIONS HEARING

BEFORE:      THE HONORABLE GERALD BRUCE LEE
             UNITED STATES DISTRICT JUDGE

APPEARANCES:

 FOR THE PLAINTIFF: CAMERON McEVOY PLLC
                    BY: JOHN P. SHERRY, ESQ.

 FOR THE DEFENDANT: AMBERLY LAW
                    BY: VINCENT M. AMBERLY, ESQ.
                    EINBINDER & DUNN
                    BY: MICHAEL EINBINDER, ESQ.
                    ---

OFFICIAL COURT REPORTER: RENECIA A. SMITH-WILSON, RMR
                         U.S. District Court
                         401 Courthouse Square
                         Alexandria, VA  22314
                         (703)501-1580

<u>INDEX</u>

ARGUMENT BY THE PLAINTIFF   4, 34

ARGUMENT BY THE DEFENDANT   16

RULING BY THE COURT         36

---

1              (Thereupon, the following was heard in open
2  court at 10:51 a.m.)
3              THE CLERK:  1:09 civil 1392, United
4  Marketing Solutions, Incorporated versus Angie M.
5  Fowler, et al.
6              Would counsel please note your appearances
7  for the record.
8              MR. SHERRY:  Good morning, Your Honor.  John
9  Sherry here on behalf of plaintiff, United Marketing
10  Solutions, Incorporated.
11              THE COURT:  Good morning.
12              MR. AMBERLY:  Good morning, Your Honor.
13  Vincent Amberly for the defendants, and Michael
14  Einbinder who has been admitted pro hac vice will
15  address the Court.
16              THE COURT:  Good morning.
17              We have cross motions for summary judgment
18  in this case, don't we?
19              MR. EINBINDER:  That's right, Your Honor.
20              THE COURT:  Who filed first?
21              MR. EINBINDER:  I think it was simultaneous.
22              THE COURT:  Simultaneously, all right.
23              MR. EINBINDER:  There's a motion to be
24  relieved as counsel.
25              THE COURT:  We'll take the motion to be

1    relieved of counsel last.  We'll let plaintiff go first.

2             MR. SHERRY:  Thank you, Your Honor.

3             Your Honor, with respect to our motion for

4    summary judgment, I believe that the issues have been

5    very thoroughly briefed, so I'll limit my comments to

6    what I think may not have been brought up at this point

7    or at least to highlight what I think are the major

8    points with respect to our motion.

9             THE COURT:  Doesn't this whole case turn on

10   whether or not the contract is ambiguous and whether or

11   not United Marketing had an obligation to personally

12   prepare all the items for these advertising coupons?

13   Doesn't it turn on that?

14            MR. SHERRY:  I believe it does.  I know that

15   the defendants have alleged certain what I believe are

16   ancillary breaches, and I think out of the seven that

17   they have listed in their discovery responses initially,

18   three of those appear to have now been abandoned because

19   they weren't addressed in the opposition to our motion

20   for summary judgment.

21            We brought them all up, Your Honor, out of

22   an abundance of caution.  And I think it speaks volumes

23   that the defendants in their motion for summary judgment

24   didn't bring up those other breaches which is consistent

25   with Mr. Fowler's testimony at his deposition that he

1    and his wife believed that the big one of the breaches

2    was United Marketing simply outsourcing the production

3    and the services.

4                THE COURT:  So, this is a franchise dispute

5    between a franchisor and a franchisee.  Is that right?

6                MR. SHERRY:  Yes, Your Honor, it is.

7                THE COURT:  And United Marketing, the

8    franchisor, entered into a ten-year contract to provide

9    certain services for, I guess it's Greensboro, North

10   Carolina, advertisements that you get in the mail, those

11   coupons that you get in the mail?

12               MR. SHERRY:  That's exactly right, Your

13   Honor.

14               THE COURT:  Now, is the contract ambiguous?

15               MR. SHERRY:  Your Honor, I don't believe

16   that the contract is ambiguous at all.  I think the

17   contract is clear that the -- that the services and the

18   products are going to be provided through United

19   Marketing Solutions.  And I think that's consistent with

20   the overall intent of the document as a franchise

21   agreement, which is as we've argued in the briefs, that

22   United Marketing Solutions is providing these

23   franchisees with the tools to go out and sell this

24   product that United Marketing has developed.

25               The way the coupon looks, the way it's been

1   put together, how it's mailed out, the process of the

2   mass mailing to these customers, targeting these certain

3   residential areas, that was all created by United

4   Marketing Solutions.

5          And, Your Honor, I submit that there's no

6   evidence that the Fowlers knew how to do any of this

7   before they signed that franchise agreement and then

8   received that information from United Marketing

9   Solutions.

10         THE COURT:  But the Fowlers say that they

11  came to some facility United Marketing has and they were

12  shown production facilities and told that, you know, we

13  make our own products here and that's why you can rest

14  assured that this franchise is going to be a great

15  success.  Is that right?

16         MR. SHERRY:  They have alleged that, Your

17  Honor.  Mr. Reed has denied that there are any

18  representations to his knowledge or to anyone else that

19  he's spoken to about the fact that the production

20  services would only ever be provided in that production

21  facility.

22         Now, Your Honor, we've noted in our brief

23  there is a specific provision in the agreement that was

24  initialed by the Fowlers, a standard boiler plate

25  clause, one that says that they agree that they're not

1    relying on any other representations that were made

2    outside of the terms of the agreement.

3            And specifically, Your Honor, I think

4    they're almost alleging that there was a fraudulent

5    representation, but I don't think they said it was

6    intentionally done.

7            But the reality of it is, Your Honor, that

8    there's no indication, I believe, that would carry the

9    day to indicate that United Marketing Solutions'

10   representatives induced them into signing this agreement

11   by stating you absolutely will never have to worry about

12   us outsourcing any of these services anywhere else.

13           And Mrs. Fowler's deposition and also her

14   affidavit don't go that far to say that, Your Honor.

15   When I asked her at her deposition what she recalled,

16   she said that she recalls being shown the production

17   facility, but she couldn't recall any specific

18   representations from any representatives indicating that

19   United Marketing would be the sole source of these

20   services.  And --

21           THE COURT:  Well, the -- it seems to me that

22   a franchise provides the franchisee with, like you said,

23   a system, advertising.  They provide them with the logos

24   like McDonalds may provide the McDonalds operator with

25   the paper that they use to wrap the burgers and the

```
 1   signs and all those things, but nobody says McDonalds

 2   has to make them in the franchise agreement.  Is that

 3   right?

 4              MR. SHERRY:  Yes, Your Honor.  That's

 5   exactly our point is they provide -- United Marketing

 6   provides the recipe and the Fowlers use that recipe once

 7   it's made to do whatever it is that's within the

 8   franchise agreement to profit.

 9              And I think the issue here is how can that

10   possibly be a material breach simply by having someone

11   else cook the recipe essentially, Your Honor, when it's

12   already laid out.

13              It doesn't make sense because I think by the

14   Fowler's logic, Your Honor, if United Marketing

15   Solutions had created another production facility

16   20 miles down the road and decided it was going to do

17   all that at that production facility, or would that be a

18   material breach because according to the Fowler's

19   implication they were told everything was going to be

20   done at this particular facility?

21              Or, if Your Honor, the Fowlers had been a

22   hundred percent satisfied with outsourcing being done at

23   a different company, perhaps they were able to provide

24   more services that weren't previously available.

25              And Your Honor Mr. Reed has indicated in
```

1    fact that was the case in his affidavit.  But, how is

2    that a material breach?  Because the primary purpose of

3    the contract is still being met which is the Fowlers

4    don't have to worry about going to anyone else to get

5    the services.  They go out and get the customers.  They

6    get the orders.  And they can look to United Marketing

7    Solutions and the obligation is on United Marketing

8    Solutions to fill the order.

9         But there is no expressed provision in that

10   contract, and I don't think that there's anything that

11   would allow the Court to imply this that United

12   Marketing Solutions has to do that with its own people.

13        THE COURT:  Well, what about the issue of

14   there were instances apparently for 22 years, everything

15   was delivered on time.  But there became a point after

16   the outsourcing occurred where they were multiple

17   instances where the coupons were delivered late and

18   according to the Fowlers, they were insufficient but

19   doesn't the contract provide for credit in those

20   instances?  Does it provide that they can terminate

21   because of that?

22        MR. SHERRY:  That's correct, Your Honor.

23   The contract expressly contemplated instances where

24   there were late mailings or where there were mistakes.

25   The Fowlers have acknowledged that there was a credit

1    system in place in their depositions.  And I believe

2    that they've testified in some instances they asked for

3    credits, but in some of these instances, Your Honor, of

4    these five out of ten mailings that they allege were

5    late during this period of outsourcing, they couldn't

6    even recall whether they had in fact asked for credits.

7            And I think that begs the question of if

8    this was such a material breach, if it was so important,

9    why would they not have immediately availed themselves

10   of the credits that they knew of and that were available

11   to them under the agreement?

12           And Your Honor, with respect to the notice

13   of termination that they gave, it was -- if I recall

14   correctly, three lines and it gave absolutely no reason

15   for the actual termination of the agreement.

16           THE COURT:  Are they required to have a

17   reason to terminate?

18           MR. SHERRY:  They're not, Your Honor.  But I

19   would have envisioned that, especially with respect to

20   the outsourcing of the services that the Fowlers would

21   have pointed to perhaps specific communications between

22   them and United Marketing Solutions leading up to that

23   July 7, 2009, termination stating, listen we don't

24   believe that you're allowed to do this.  We think that

25   you're violating the agreement.  What are you going to

1  do about it?

2           But they haven't pointed to anything like

3  that, Your Honor, and I think it speaks volumes for the

4  fact that --

5           THE COURT:  Well, you're asking me.  I can't

6  reach into the credibility on summary judgment.  Let's

7  stay away from that.

8           MR. SHERRY:  Yes, Your Honor.

9           THE COURT:  Help me with your theory of

10  damages.  I thought it was difficult to follow in terms

11  of how United Marketing Services (sic) is entitled to

12  whatever profits the Fowlers have made.  It was very

13  thin.  And also you asserted a claim for invoices, but

14  did you give the invoices?

15           MR. SHERRY:  I haven't, Your Honor, and the

16  invoices -- the invoices I believe are disputed.  So I

17  think to the extent we get that far, Your Honor, that we

18  would end up having -- we have a material issue fact on

19  whether the invoices are due.

20           Our position is that these are invoices for

21  payments that weren't made at the time the Fowlers

22  terminated the agreement and include incentives that

23  were given to the Fowlers based on the fact that they

24  would make a certain number of mailings going forward in

25  the future.

1          THE COURT:  But you said there's a genuine

2     issue of fact about that.

3          MR. SHERRY:  I believe that's correct, Your

4     Honor.

5          THE COURT:  Well, then how do you get to

6     lost profits meaning taking the profits that the Fowlers

7     may have made?  How do you get there?

8          MR. SHERRY:  Well, Your Honor, there are two

9     ways.  First we have our expert designation on this,

10    competing expert designation, competing expert report on

11    the issue of the actual number of the damages.

12          But the position that we've taken, Your

13    Honor, and as set forth in our expert report is the

14    Fowlers wrongly terminated the agreement on July 7th of

15    2009.  They immediately began doing business as this new

16    company.

17          Essentially, Your Honor, all they did was

18    they changed the name of the company.  They kept, I

19    believe, a majority of the customers that they had as

20    United Marketing franchisee and they also employed some

21    of the same previous employees and kept the same office.

22          So, from a baseline perspective, Your Honor,

23    we're not faced in the loss profits determination of

24    looking at a new type of business and trying to

25    determine what the profits are.

1              I submit, Your Honor, it's easier in this

2    instance because United Marketing Solutions had a right

3    to expect a certain amount of profits from the Fowlers

4    had they continued under that particular agreement.

5              The Fowlers did not do so, and we submit

6    that they breached the agreement.  But the reality is

7    that we know exactly the amount of money that the

8    Fowlers were making for United Marketing Solutions in

9    terms of profits from 2007-2008 and starting through

10   2009.

11             And so, Your Honor --

12             THE COURT:  So your view is any dollars that

13   they made belonged to United Marketing?

14             MR. SHERRY:  Well, Your Honor --

15             THE COURT:  You're entitled to a portion of

16   them?

17             MR. SHERRY:  We believe that.  We have two

18   theories -- two primary theories of recovery on damages.

19   The first is that we should be entitled to the loss of

20   profit that United Marketing Solutions was accustomed to

21   gaining from the Fowlers.  And we have taken that

22   through, Your Honor, the end of the noncompete period

23   because what essentially happened when the Fowlers

24   terminated is they just began doing business under a

25   different name, but they kept the majority of the

1   customers.

2           THE COURT:  But they had the right to

3   terminate on notice, right?

4           MR. SHERRY:  They did.

5           THE COURT:  So there's no guarantee they

6   were going to stay 10 years or 12 years, right?

7           MR. SHERRY:  There's no guarantee of that,

8   Your Honor.  But we only carried out through the

9   24-month period of the noncompete because while they

10  would have had a right to terminate with 120-day notice,

11  they certainly would not have had a right to continue to

12  do the business that they were doing previously as

13  United Marketing Solutions franchisee.  And what that

14  ended --

15          THE COURT:  Under the noncompete and

16  nonsolicitation?

17          MR. SHERRY:  Yes.

18          THE COURT:  Let me just wrap this up with

19  one other question.  If the damages are quantifiable as

20  you've just asserted, why would there be any claim for

21  equitable relief concerning disgorgement?

22          MR. SHERRY:  Well, Your Honor, if the

23  damages are quantifiable, then there would be no

24  equitable claim for relief under disgorgement.  Those

25  are alternative theories of recovery of damages, Your

1   Honor.

2          If for some reason the Court finds that it

3   can't ascertain with reasonable certainty the number

4   through our expert, then in the course of providing for

5   damages or fashioning a remedy for my client, we submit

6   that disgorgement would in that case be proper.

7          THE COURT:  And, there will be no need for

8   an injunction because United Marketing is out of

9   business; is that right?

10         MR. SHERRY:  Your Honor, I don't think there

11  would be no need for an injunction because United

12  Marketing Solutions is out of business.  I think there

13  would be no need for an injunction if United Marketing

14  Solutions was able to recover damages and this Court

15  found that the monetary damages were sufficient to

16  remedy or satisfy the breach.

17         But if this Court found that because of

18  whatever factual or legal circumstances exist that

19  United Marketing Solutions for some reason should not be

20  entitled to recover any monetary damages and that the

21  Fowlers should be continued -- continuously able to run

22  this competing business, then I think the preliminary

23  injunction or the permanent injunction at that point,

24  Your Honor, should be granted.

25         THE COURT:  All right.  I've asked you all

1    the questions I have.  Thank you.

2              MR. SHERRY:  Thank you, Your Honor.

3              MR. EINBINDER:  Good morning, Your Honor.

4              THE COURT:  Good morning.  You're

5    Mr. Onbacher, right?

6              MR. EINBINDER:  Einbinder.

7              THE COURT:  Thank you, Mr. Einbinder.

8              MR. EINBINDER:  Your Honor, the first

9    question you asked is the one I want to address

10   specifically.

11             This contract is not ambiguous.  It provides

12   in numerous places in both the contract and in the

13   disclosure document that was provided to the client, the

14   uniformed franchise offering circular that was provided

15   to my client that United Marketing Services is going to

16   be the sole source, is going to furnish, is going to

17   print and mail the coupons which are the subject of the

18   franchise agreement.

19             This was a business pursuant to which the

20   franchisee obtained printing services from the plaintiff

21   and it's repeated throughout the document.

22             Now what counsel does is he comes up here

23   and he invents an entirely new purpose and intent of the

24   contract, ignoring the very language that's in the

25   document itself.  That language unequivocally states

1    they will be the sole source.

2                We examined --

3                THE COURT:  The sole source, that has --

4    your interpretation of it is that United Marketing was

5    to be the printer of the documents; is that right?

6                MR. EINBINDER:  Correct, in other words,

7    they were a print broker, Your Honor.

8                THE COURT:  And as it relates to your

9    client, the franchisee which is selling -- mailing these

10   coupons in Greensboro, they would be the sole source of

11   the coupons for the client's business in Greensboro; is

12   that right?

13               MR. EINBINDER:  That's correct, the origin

14   of the printing of those products according to the

15   dictionary definition.

16               THE COURT:  So we're talking about printing

17   coupons, right?

18               MR. EINBINDER:  That's correct, Your Honor.

19               THE COURT:  We're not talking about making

20   miniature statutes by an artist.  We're not talking

21   about a commissioned artwork.  We're talking about

22   printing coupons.

23               MR. EINBINDER:  Correct, Your Honor.

24               THE COURT:  And your view is that because

25   the contract requires the franchisor to provide printing

1    services and production service to the franchisee that

2    that means they cannot outsource?

3              MR. EINBINDER:  That's correct, Your Honor.

4    And whether or not it's specialized services or not is

5    irrelevant to the question.  We first have to look at

6    the contract itself.

7              There are, again, a number of phrases, a

8    number of provisions in the contract that are

9    unequivocal.  There's no way to read those other than to

10   require them to provide, to print, to be the source.

11             Your Honor, we defined the word "source"

12   from the dictionary as "being the origin of", Your

13   Honor.  And they have to be the origin of the printing

14   services.

15             THE COURT:  If they ship the coupons to your

16   client, and they meet all of the requirements of a

17   nice-looking coupon that we get in the value packs at

18   least around this area, how does your client know

19   whether or not it was done in their plant or somewhere

20   else?

21             MR. EINBINDER:  Well, there's a lot of

22   direct contact between my -- there was for a period of

23   time for which there -- before there was outsourcing a

24   tremendous amount of contact between my client and --

25             THE COURT:  My question was very precise.

1   If the coupon arrives at your client's doorstep in

2   Greensboro and it looks like a nice coupon for Doctor

3   Car Wash that they got -- received before, how would

4   your client know where it was printed?

5            MR. EINBINDER:  It doesn't arrive at my

6   client's doorstep.  It gets mailed to the consumers in

7   the area, Your Honor.

8            THE COURT:  So your client has no way of

9   knowing one way or the other whether or not it was

10  produced at the plant in United Marketing or somewhere

11  else or Kinko's, do you?

12           MR. EINBINDER:  Presumably if it's printed

13  somewhere else and it gets there and there's no problem

14  with it, my client won't hear about there being a

15  problem.

16           THE COURT:  Then how could there be a

17  material breach?

18           MR. EINBINDER:  Well, it becomes a -- first

19  of all, it's a requirement.  I don't have to establish

20  that it became a problem, but we have in fact

21  established that it became a problem.

22           THE COURT:  My question is how does a coupon

23  originating from Kinko's arriving at the consumer's

24  doorstep constitute a material breach of a franchise

25  agreement?

1          MR. EINBINDER:  Because the contract

2    explicitly provided they were going to provide it.

3               Your Honor, if I --

4               THE COURT:  Let's focus for a second.  We're

5    talking about a business transaction here, and the

6    objection of it is for the Fowlers to make money by

7    delivering coupons to a consumer's household, right?

8               MR. EINBINDER:  That's correct.

9               THE COURT:  If the coupon gets to the

10   consumer's household and it's a nice-looking coupon, how

11   could that be a material breach of the overarching

12   ten-year franchise agreement?

13              MR. EINBINDER:  Once again, Your Honor, the

14   requirement is that they deliver it.

15              Your Honor, if my client were to buy a GM

16   car and someone delivered a Chrysler car instead, that

17   would not be what my client bargained for.

18              THE COURT:  We don't have that here, do we?

19   There's no complaint about the quality of the coupons

20   until the outsourcing occurred and even that was only in

21   a limited number of instances; is that right?

22              MR. EINBINDER:  In a number of instances,

23   yes.  I wouldn't call it limited, Your Honor.

24              THE COURT:  All right, well --

25              MR. EINBINDER:  There are a number of

1    instances -- the problem is my clients were told -- my

2    clients were entitled to continue the contract as

3    existed which was to be able to deal directly with the

4    franchisor when there were printing problems which

5    became a problem in the instances in which they were

6    outsourced, to make sure that printing was done

7    correctly which became a problem when they were

8    outsourced.

9            There were a number of instances in which

10   there were problems.  I wouldn't call it limited at all,

11   Your Honor.

12           At this point in time, we haven't submitted

13   proof on it but that the contract in my view is clear as

14   a bell that they're required to produce it.

15           We can examine whether or not that was a

16   problem.  We may have to do that at trial.  But I

17   believe that the contract was explicit.  My clients were

18   shown a production facility, shown -- told about a

19   20 years of service, advised that this was only going to

20   be done at this production facility in this way and were

21   entitled to have someone be a printer as opposed to a

22   print broker for them.

23           And Your Honor, to the allegation or to the

24   analogy to McDonalds, I've read the McDonalds contract.

25   It doesn't require McDonalds to produce the hamburger

1　meat.  In fact it allows the franchisee to acquire

2　hamburger from any source it wants to as long as it

3　meets certain quality standards.

4　　　　　　That's not what this contract provided for.

5　This contract provided for printing and mailing and sole

6　source of supply.  Nothing --

7　　　　　　THE COURT:  Well, it sounds to me -- and I

8　understand your interpretation may differ from opposing

9　counsel's but the -- if the bottom line on the contract

10　is that United Marketing is to supply a Doctor Car Wash

11　coupon to Ms. Smith's house in Greensboro, they did that

12　except in a number of instances that you are complaining

13　about now.

14　　　　　　MR. EINBINDER:  Correct, Your Honor.

15　　　　　　THE COURT:  And, before there was a

16　complaint, your client had no way of knowing whether it

17　was produced in United Marketing Services or Kinko's or

18　some place else; is that right?

19　　　　　　MR. EINBINDER:  Honestly, Your Honor, I

20　don't know if they would have been able to tell.  But

21　there is no complaint that it occurred.

22　　　　　　THE COURT:  There is no complaint that it

23　occurred?

24　　　　　　MR. EINBINDER:  Not at this point.

25　　　　　　THE COURT:  All right.  Well, if your -- and

1    this is a very precise question.  If your defense to

2    breach of contract is that United Marketing breached

3    first, and I determined they did not, there is no basis

4    to grant your motion for summary judgment; is that

5    right?

6              MR. EINBINDER:  No, Your Honor.  There isn't

7    any.

8              THE COURT:  Why not?

9              MR. EINBINDER:  Because they can't prove

10   damages.  As a matter of law, they can't prove damages.

11   They would have no remedy.

12             THE COURT:  All right.

13             MR. EINBINDER:  The law in Virginia is that

14   when there's a notice provision in a contract that

15   states that someone can cancel that contract on a

16   specific period of time notice, the damages are for that

17   period of time, in this case, 120 days.

18             We alleged, they did not respond, did not

19   contest the fact that during that 120-day period there

20   were no printings and mailings that had to be done.  So

21   there is no damage during the 120-day period.  That's

22   not an issue here, Your Honor.

23             They're claiming they're entitled to damages

24   past the 120-day period and they're not.  They have

25   speculative claims.  They have a shifting -- Your Honor

```
 1   indicated that you were somehow confused by the damage

 2   claim.  So am I.  And the reason for that --

 3           THE COURT:  I'm only concerned about the

 4   issue of loss profits, how they could say -- how the

 5   franchisor could say I'm going to take all the profits

 6   made by the franchise from the Fowlers.  But I don't

 7   think they would be entitled to under the franchise

 8   agreement.

 9           MR. EINBINDER:  That's correct, Your Honor.

10   First of all, they're not claiming loss profits.  It's

11   disgorgement that they're claiming what my clients made.

12   That's what they're seeking, disgorgement.

13           THE COURT:  Exactly, of profits that the

14   Fowlers made --

15           MR. EINBINDER:  Right.

16           THE COURT: -- that they're saying they were

17   entitled to under the franchise agreement.

18           MR. EINBINDER:  No.

19           THE COURT:  They're saying they're entitled

20   to take it away from you because you breached the

21   franchise.

22           MR. EINBINDER:  Correct.

23           THE COURT:  But I think we're all clear

24   that's not going to happen.

25           MR. EINBINDER:  I think we're all clear on
```

1   that.

2              THE COURT:  All right.

3              MR. EINBINDER:  What they claim for loss

4   profits, Your Honor, what they claimed actually for the

5   200 and some odd thousand dollars that they're claiming

6   which by the way started at $500,000, went to $750,000,

7   then went to $273,000 and then went to $238,000 and

8   several iterations of it, expert report and pleadings.

9              But the last version of their damage claim

10  is $230,000.  And what it represents is that alleged

11  profit that they would have earned by doing X number of

12  more printings for X number of years.

13             THE COURT:  I understood that part of their

14  argument.  Well, let's focus just for a second here.

15             So are you relying upon a particular

16  definitive Virginia Supreme Court case that says only

17  the notice period is only entitled to damages?

18             MR. EINBINDER:  Yes, we cited a case in our

19  brief.

20             THE COURT:  All right.  Well, what case is

21  it that all they get is the notice period?

22             MR. EINBINDER:  Give me a moment.

23             Your Honor, the case that we cited is the

24  *Board of Directors of Newberry Condominium Association*

25  *versus Green Team,* and it's cited at page 14 of our

1    opening briefly.

2              THE COURT:  Is that a Virginia Circuit Court

3    case?

4              MR. EINBINDER:  That's correct.

5              THE COURT:  That's not a Supreme Court of

6    Virginia case?

7              MR. EINBINDER:  No.

8              THE COURT:  That's all you have?

9              MR. EINBINDER:  No, I wouldn't say, no.

10   That's consistent with the law in a number of different

11   jurisdictions.  The damages have to be limited to that

12   period of time because the reasonable expectation of the

13   parties when they enter into the contract is that they

14   would only have the relationship for a period of time

15   until it's terminated properly.

16             THE COURT:  Well, let me ask you this.  That

17   may be true if the franchisee was ending their business

18   operations.  But here I have a 24-month noncompete,

19   nonsolicitation.  And apparently there's an admission

20   that the Fowlers just basically changed their name.

21   They're continuing to use United Marketing's equipment

22   and employees and customers.  So, that's not the same,

23   is it?

24             MR. EINBINDER:  Well, Your Honor, the

25   problem is the confusion in the way the allegations have

1    been made.

2                THE COURT:  No, I want to focus on my

3    question which is that if you're trying to limit damages

4    to 120 days which is the notice period, maybe if that

5    was the end of the franchisee's business, that argument

6    would have plausibility.

7                I'm having difficulty with the idea that

8    they could, in violation of the noncompete and the

9    nonsolicitation agreement, continue their business and

10   not incur any liability.

11               Can you address that question?

12               MR. EINBINDER:  Yes, Your Honor.  Well you

13   have to look at when you analyze the question of whether

14   they're entitled to damages for the violation of the

15   noncompete is the law of what damages you get for

16   competing when you have a noncompete clause.

17               And what you get is the loss profit.  That

18   is the difference between what you would have earned --

19               THE COURT:  Exactly.

20               MR. EINBINDER:  -- and what you did earn.

21               THE COURT:  For a period of two years, not

22   just 120 days.

23               MR. EINBINDER:  For a period of two years.

24   And that case that's cited in our brief, not by then,

25   but in our brief, is a case involving a franchise, where

1    the franchisor had another franchisee doing business

2    near at the location where the former franchisee

3    operated.

4             And the damage claim was based on the

5    difference between what the franchisor earned from the

6    defendant franchisee and the new franchisee, a

7    differential.

8             THE COURT:  I understand.

9             MR. EINBINDER:  In this case, it's between

10   what they earned allegedly, no proof, but what they

11   earned allegedly and what -- and zero.  And the reason

12   it's zero is because they're out of business which

13   defines the speculativeness of this claim, Judge.

14            THE COURT:  Well, let's take up the motion

15   in limine now since you brought that up.  It's zero

16   because they say -- United Marketing says that the

17   Fowlers and other leaving, they had to shut down.

18            There's been a motion in limine filed.  I'm

19   not sure whether it was by the defendant -- by the

20   defendant asking the Court to keep out evidence that the

21   company closed --

22            MR. EINBINDER:  No, that we put them out of

23   business is what I want to keep out.

24            THE COURT:  I understand.  I said that they

25   closed meaning that as a result of not only United --

1    not only the Fowlers but other franchisees leaving they

2    went out of business.

3              MR. EINBINDER: We specifically asked to

4    exclude evidence concerning allegations that my client's

5    actions put them out of business.

6              THE COURT: Correct. Why would I exclude

7    that?

8              MR. EINBINDER: It's not relevant to a

9    single issue in this case. It doesn't tend to prove the

10   breach. It doesn't tend to prove the damages. It

11   doesn't tend to disprove our defenses to the damages.

12   It doesn't tend to prove anything. It's irrelevant.

13   It's speculative. In all honesty, Your Honor, it's

14   unprovable.

15             They had 20 franchisees, and my client was

16   one of them that left in two years, a company that had

17   filed with the SEC --

18             THE COURT: You're saying only one

19   franchisee left in two years?

20             MR. EINBINDER: No, 20 left in two years.

21             THE COURT: Twenty left in two years, right.

22             MR. EINBINDER: My client was one of them.

23             THE COURT: All right.

24             MR. EINBINDER: And this was a company which

25   according to its own SEC filings had extreme

1  unlikelihood of continuing to exist as a going concern

2  for two years.

3            Prior to my client's termination of the

4  agreement, the SEC's file for year ending '08 was that

5  the company would not survive.

6            The loss -- the cumulative losses for this

7  company over the last several years were probably four

8  and a half million dollars.

9            THE COURT:  I see.  I see.

10            MR. EINBINDER:  This is a company that was

11  going down the tubes.  And unfortunately, that occurred

12  not because of my client but because of their business

13  structure or whatever.  It's not an issue in this case,

14  but yet they come back and always assert that somehow my

15  clients were responsible for it when even if the

16  franchisees were responsible for leaving and causing the

17  demise, my client is one of 20.

18            It's speculative, Your Honor.  It has

19  nothing to do with any of the issues in the case.  It's

20  not probative.  And in order to make the claim they have

21  to bring in evidence about 20 other people.

22            It's not even a claim they made.  It's a --

23  counsel saying to me in discussions and I was concerned

24  it was going to be raised, and I don't see the relevance

25  and see any relevance raised by them.

1          THE COURT:  So your view is that the breach

2    of contract claims is limited to the damages for

3    franchisee's fees or commissions that United Marketing

4    would have received and whether United Marketing is

5    entitled to damages for violation of a noncompete,

6    nonsolicitation clause that they can prove.

7          MR. EINBINDER:  Well, Your Honor, my view is

8    that the contract was unambiguous and our interpretation

9    is correct.  But beyond that, Your Honor, they can't

10   prove damages.

11         We have a shifting target in terms of

12   damages.  But the Rule 26 disclosure say that we by the

13   way, Your Honor, had to fight to get and they got

14   sanctioned for not providing to us and they still

15   haven't paid that sanction, Your Honor.

16         But what they told us in their Rule 26 is

17   that they were seeking disgorgement for the competition,

18   not loss profits but disgorgement for the competition.

19         And the alleged loss profits represented the

20   profit that they would have earned but for the fact that

21   my client terminated early.  That's their claim.  That's

22   what their claim is.

23         So if we're clear about that, Your Honor, as

24   a matter of law they're not entitled to disgorgement

25   which is the claim they made in their Rule 26 for our

1    competition.

2              THE COURT:  Well, counsel just admitted that

3    there are -- there is a quantifiable monetary amount

4    that they seek which would be damages at law so there

5    would be no basis for equitable relief, call it

6    disgorgement or injunction really.

7              MR. EINBINDER:  I agree with that, Your

8    Honor.

9              THE COURT:  All right.

10             MR. EINBINDER:  But when they provided a

11   Rule 26 disclosure and we conducted discovery based on

12   that, they contended that the competition claim -- the

13   damages for competition was disgorgement not loss

14   profits.  That's as clear as a bell.  That's what they

15   said, not what I said.  It's what they said.

16             We build a case on that.  And we come and we

17   make summary judgment motions, and they shift and they

18   make an allegation that the loss profits are really

19   about competition.  So we addressed that, Your Honor,

20   and we call it speculative.

21             And the reason it's respective is they can't

22   provide -- they don't have a franchisee or a business in

23   the area that is making less money because we're

24   competing than they had before.  They don't have

25   franchises.  They're out of business.  They don't sell

1    franchises, haven't for two years.

2              Your Honor, before my client quit the

3    franchise, they hadn't sold franchises.  Not like they

4    had one next door or they wanted to put one in and

5    that's what they said in their papers.  We couldn't put

6    a new franchisee in.  It's a company out of business.

7              THE COURT:  All right.  I've asked you all

8    the questions that I have and I think I understand your

9    position.  Thank you.

10             MR. EINBINDER:  May I address one more

11   point, Your Honor?

12             THE COURT:  Very briefly.

13             MR. EINBINDER:  And I think you've already

14   addressed this, but I just want to make sure.

15             There has been a claim for breach of the

16   noncompetition and they're requesting an injunction.

17   And I believe you're indicating that it's not.

18             I think it should be dismissed as a matter

19   of law.  They haven't established at all any of the

20   requisites for obtaining injunctive relief.

21             THE COURT:  I said that I thought just a

22   second ago that they have not shown a basis for

23   disgorgement which is equitable remedy because they have

24   a quantifiable amount of damages.

25             And if they're out of business they don't

```
 1   need an injunction.  That doesn't mean that the Fowlers

 2   are not liable for violating the noncompete or

 3   nonsolicitation as relates to the breach of contract

 4   claim.

 5            MR. EINBINDER:  The damage claim is a

 6   different story.  The injunctive claim is not, Your

 7   Honor, I agree.

 8            Thank you.

 9            THE COURT:  Thank you.

10            MR. SHERRY:  Just very briefly, Your Honor.

11   With respect to the points raised on the motion in

12   limine, Your Honor, we believe that this information is

13   relevant because Mr. Einbinder has talked about the fact

14   that a number of franchisees left during a pretty

15   concentrated period.

16            Our positions always has been that the

17   franchisees jumped ship.  We believe that this e-mail

18   shows the true motive of why the Fowlers terminated the

19   agreement because they wanted out.

20            And in 2007 when franchisees were beginning

21   to leave, Your Honor, this shows that the Fowlers were

22   reaching out to an outsourcer, to a third party who

23   provided these production services.

24            THE COURT:  I thought you told me that the

25   contract allowed them to get out on 120 days' notice.
```

1          MR. SHERRY:  It did, Your Honor, but --

2          THE COURT:  So the reason doesn't matter,

3  does it?

4          MR. SHERRY:  Well, I think it only matters

5  for purposes of showing the true motive as to why they

6  terminated the agreement.  And I think it ties into they

7  terminated the agreement and immediately started doing

8  business -- started doing the same business only in

9  changing the name.

10          THE COURT:  But is motive relevant for

11  breach of contract?

12          MR. SHERRY:  Well, I think, Your Honor, I

13  think it is in this instance because of the fact that we

14  believe that the Fowlers alleged a breach is in fact not

15  true.  That the evidence is going to show that they

16  never complained throughout the course of these services

17  being outsourced about that being a breach of the

18  agreement.

19          In fact they continued to accept benefits

20  under the contract.  They provided the notice.  The

21  notice didn't contain any details.  There were no

22  written correspondence on or about the time of the

23  notice complaining about the outsourcing.

24          And in fact the company that they

25  immediately went to, and the evidence shows, Your Honor,

1   that as early as March of 2009 when they terminated, as

2   early as March they were contacting none other than

3   Precision Direct which is the company that they've been

4   talking about back in 2007 with these other franchisees

5   who ultimately jumped shipped.

6            So, Your Honor, we submit it's relevant for

7   those purposes.

8            THE COURT:  All right, thank you.

9            Let the record reflect this matter is before

10  the Court on cross motions for summary judgment, and the

11  issues in both motions seem to be quite similar.

12           And at the outset, the question presented is

13  whether the Court should grant summary judgment as a

14  matter of law on plaintiff's breach of contract claim

15  because the plaintiff terminated the agreement without

16  giving the requisite 120-day notice and immediately

17  opened an identical business employing former UMS

18  employees in violation of the noncompete and

19  nonsolicitation clauses where the defendants claim that

20  the plaintiff breached the contract first and that their

21  nonperformance is excused because the plaintiff, United

22  Marketing materially breached the agreement by

23  outsourcing the printing and services.

24           I'm going to grant summary judgment in favor

25  of the plaintiff.  The parties do not dispute the

1    defendant breached the agreement, and the nonperformance

2    is not excused by plaintiff's conduct because the

3    conduct does not constitute a material breach of

4    contract.

5            This is a franchise agreement involving the

6    distribution of mass mail business advertising coupons

7    to residential areas.  And in May 2002, the defendant

8    entered into a ten-year area franchise license agreement

9    where the Fowlers became franchisees.

10           And this is a direct mailing coupon program

11   in territories located, I think, in the area of

12   Greensboro, North Carolina.

13           The contract does state in numerous places,

14   paragraphs four and five, that UMS was to furnish the

15   defendants with various printed products and production

16   services, including distribution of materials.  UMS was

17   to be the sole source of direct mail co-opt advertising

18   products and services.  UMS was to print and mail all

19   products within 15 days of the order.

20           And if there was a failure to follow up,

21   fill out these obligations, the defendant's remedy was a

22   credit toward future purchases.

23           I don't think the agreement is ambiguous.  I

24   think that I don't think that the agreement requires

25   that only United Marketing Solutions could print coupons

1    that were being mailed directly to the consumer that the

2    franchisee never saw, as long as they can conform to the

3    intent of the agreement.

4           The sole source aspect of this means that

5    the franchisee was not to seek coupons from other

6    places.  And these coupons, some of which were supplied

7    by, I believe, Lido's Pizza or Papa John were supplied

8    directly by the company itself.

9           So I have no difficulty here concluding that

10   this contract was not ambiguous and that the defendant's

11   theory that the plaintiff breached the contract by

12   outsourcing was a material breach which would excuse

13   their nonperformance.

14          So for those reasons, I'm granting the

15   plaintiff's motion, and I would likewise deny the

16   defendant's motion for summary judgment on the issue of

17   outsourcing.

18          And again, I note that defendant's complaint

19   about untimely deliveries of coupons or the quality of

20   coupons, even in the agreement itself, was covered by

21   credits.  And the notice of termination made no mention

22   of unhappiness or complaint about the fact that the

23   outsourcing was insufficient, even if it was.

24          Just interpreting the contract with the

25   plain meaning, plain words, "furnish" means to provide.

1    It doesn't say that they have to produce it themselves.

2              It would be different if this were a

3    contract to produce sculpture or commissioned artwork or

4    something like that, some specialized person services

5    contract.

6              Here we're talking about a franchisor

7    agreeing to provide a system, services, documents, logos

8    and those things can be produced anywhere.

9              As it relates to whether the Court should

10   grant the plaintiff's motion for a loss profit damages

11   claim where the 120-day notice period was not complied

12   with and where the plaintiff's got out of business, it

13   seems to me that there is -- there's insufficient

14   evidence before the Court to -- and a genuine issue of

15   fact concerning loss profits and damages here.

16             I can't tell what the damages are, what the

17   Fowlers owed or should have paid, whether the profit is

18   the amount that would be recoverable under breach of

19   contract.

20             And so, for those reasons, I think it's a

21   question of fact for the jury, and I'll deny the motion.

22   And I'm not making any judgment now about whether or not

23   the damages are speculative because it seems to me these

24   businesses, at least the plaintiff's business has been

25   in existence for a significant period of time.  And I

 1    don't have enough information to make a judgment about

 2    the defendant's business.

 3              On the issue of whether the Court should

 4    grant summary judgment for the defendant on a

 5    plaintiff's request for equitable remedies of

 6    disgorgement and preliminary injunction on its breach of

 7    contract claim, it's clear to me from the colloquy and

 8    from the briefs that what plaintiff seeks here are money

 9    damages and they're quantifiable.  That would mean

10    there's a remedy at law and equity would not allow --

11    would not apply because of the amount of money damages.

12              So I would deny the -- I will grant the

13    defendant's motion for summary judgment on the breach of

14    contract claims for disgorgement and for injunction.

15              Here, United Marketing is out of business so

16    there would be no showing of irreparable harm with

17    respect to injunction and enjoining the operation of the

18    Fowlers' new business.

19              Thank you.

20              On the motion in limine, I'm going to grant

21    the motion to exclude evidence of what the other

22    franchisees did.  I think that plaintiff can present

23    evidence about the quantity of the work it provided,

24    that the Fowlers never complained about anything.

25              But whether other franchisees left and why

1  they left is irrelevant.  And the e-mail from 2007 is

2  two full years before the Fowlers left.  And it seems to

3  me that that does not bear -- does not tend to prove or

4  disprove breach of contract.

5          Let's take up plaintiff's motion to

6  withdraw.  My question first is if you leave, who's

7  going to take over the case?

8          MR. SHERRY:  Your Honor, we don't know who

9  is going to take over the case.  We've not had any

10  discussions about what particular substitute counsel

11  that United Marketing intends to get, but we do believe

12  that they do intend to get substitute counsel.

13          THE COURT:  Well, who would I send notice if

14  I allow you to withdraw?  Do I have any statement from

15  the United Marketing Solutions that they're going to

16  hire counsel or who is their registered agent for

17  purposes of contact.

18          I see Daryl Reed's name on this service.

19  Has Mr. Reed filed anything?

20          MR. SHERRY:  He has not, Your Honor.  He's

21  the president of United Marketing Solutions.  We've been

22  in touch with him over the course of the past two weeks

23  in discussions leading up to that, in filing the motion

24  and after that.

25          The address that we've included on the order

1    is the address of his personal residence which is where

2    service was posted, Your Honor.

3              The reason we filed a motion when we did was

4    because we're at a point in terms of the way things are

5    scheduled we had two months before the actual trial

6    date.  We submit his --

7              THE COURT:  I have an idea.  I have an idea.

8    Mr. Green has not arrived.

9              MR. SHERRY:  I'm sorry.

10             THE COURT:  I have an idea Mr. Green has not

11   arrived.

12             MR. SHERRY:  Mr. Reed, yes, your Honor.

13             THE COURT:  Mr. Green has not arrived.

14   There's a fee issue here.

15             MR. SHERRY:  Oh, sorry, Your Honor.  I'm

16   very --

17             THE COURT:  When I was in private practice,

18   we called it Mr. Green.  And if Mr. Green didn't arrive,

19   then Mr. Lee would not go to court.

20             MR. SHERRY:  Your Honor, I would say this

21   that Mr. Green may be -- he may be in the room, but

22   there were -- there were additional issues, Your Honor

23   that we --

24             THE COURT:  Well, here is the difficulty I

25   have, counsel.  And I certainly understand your position

1    and I've stood there before.

2              I don't have proof of services -- posted

3    service on Mr. Reed.  He's not here.  There's no

4    registered agent.  What's going to happen to my lawsuit

5    if I don't have somebody before the court?

6              What I'd like you to do is to get him

7    personally served and set it for next Friday -- not next

8    Friday but the following Friday.  And if he does not

9    appear, then I'll let you out.

10             But I can't -- I need to have some

11   understanding that he knows what's going to take place

12   with his lawsuit.

13             MR. SHERRY:  I understand, Your Honor.

14             THE COURT:  Thank you.  You're excused.

15   Thank you.

16             (Proceeding concluded at 11:34 a.m.)

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

1
2
3          I, Renecia Wilson, an official court
4    reporter for the United State District Court of
5    Virginia, Alexandria Division, do hereby certify that I
6    reported by machine shorthand, in my official capacity,
7    the proceedings had upon the motions in the case of
8    United Marketing Solutions vs. Angie Fowler, et al.
9          I further certify that I was authorized and
10   did report by stenotype the proceedings and evidence in
11   said motions, and that the foregoing pages, numbered 1
12   to 43, inclusive, constitute the official transcript of
13   said proceedings as taken from my shorthand notes.
14          IN WITNESS WHEREOF, I have hereto
15   subscribed my name this 18th day of October, 2010.
16
17                                  /s/
                            Renecia Wilson, RMR, CRR
18                          Official Court Reporter
19
20
21
22
23
24
25